## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT W. SOLOMON,** | : | **Civil No.  1:22-CV-359** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Robert Solomon's Social Security appeal calls upon us to consider longstanding principles regarding the duty of an Administrative Law Judge (ALJ) to fully articulate the basis of a residual functional capacity (RFC) assessment, particularly when that RFC rejects the medical opinions of treating and examining physicians on the record before the ALJ in favor of nonexamining, consulting opinions. We are then invited to apply these settled tenets to the Commissioner's regulations governing the evaluation of medical opinions.

Solomon asserted in 2016 that he was disabled due to a number of impairments. In 2017, his treating physician diagnosed him with bilateral carpal tunnel syndrome and bilateral ulnar neuropathy. Solomon treated for this impairment

with his treating physician and others throughout the relevant period in this case. In 2020, Solomon's treating physician, along with a consulting examining physician, opined that Solomon's carpal tunnel syndrome precluded him from performing fine and gross manipulation with his hands. (Tr. 1402, 1555). Specifically, his treating physician opined that Solomon would be unable to perform *any* gross and fine motor movements of his fingers. (Tr. 1555). Additionally, the examining source opined that Solomon was unable to perform *any* repetitive gripping, squeezing, or fine manipulation movements because of his carpal tunnel syndrome. (Tr. 1402).

In denying Solomon's disability application, the ALJ gave these opinions little weight, reasoning that they were not consistent with the longitudinal treatment records. The ALJ relied on her findings that there were no records indicating that Solomon had lost full strength in his upper extremities or that he had significantly reduced strength in his hands. However, the ALJ's proffered reason for rejecting these treating source opinions was incorrect. The medical record was replete with notations regarding impairments of Solomon's upper extremities. The ALJ did note in her decision findings of continued "patchy sensory deficits" in the right upper extremity, decreased sensation, and positive Tinel[1] signs during the relevant period.

---

[1] A Tinel sign is "a tingling feeling you get when your healthcare provider taps your skin over an affected nerve. Test results can help them diagnose nerve compression." Cleveland     Clinic,     Diagnostics     and     Testing,     Tinel's     Sign,

(Tr. 25-27). Notably, the ALJ did not explain how the absence of such findings of total loss of strength negated these treating and examining source opinions which found Solomon unable to perform these gross and fine manipulation movements. The ALJ then fashioned an RFC that limited Solomon to a range of light work with additional limitations that far exceeded these two opinions; namely, the ALJ limited Solomon to "*frequent* fingering and feeling for fine manipulation, and *frequent* grasping and handling for gross manipulation." (Tr. 20) (emphasis added). Thus, it appears that the ALJ relied on her own interpretation of the plaintiff's medical records to conclude that these opinions were only entitled to limited weight.

In this case, we are mindful of the fact that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant," and recognize that "even though an ALJ is not bound to accept the statements of any medical expert, he may not substitute his own judgment for that of a physician." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013). Here, in a case in which the ALJ rejected a treating source opinion in favor of nonexamining, consulting opinions which predated Solomon's diagnosis of carpal tunnel syndrome

---

https://my.clevelandclinic.org/health/diagnostics/22662-tinels-sign (last accessed February 24, 2023).

and were rendered four years prior to the treating source and examining source opinions, we conclude that the ALJ's burden of articulation has not been met in this appeal. Accordingly, we will remand this case to the Commissioner for further administrative proceedings.[2]

## II.   <u>**Statement of Facts and of the Case**</u>

On August 8, 2016, Robert Solomon applied for disability insurance benefits alleging that he was totally disabled as of January 30, 2015, due to a number of impairments. (Tr. 128). Solomon was 42 years old at the time of the alleged onset of his disability, had a high school education, and had past work as a truck driver. (Tr. 140, 404).

With respect to Solomon's impairments,[3] the record revealed the following:

Solomon treated with Dr. Marie Adajar, M.D., his treating physician, during the relevant period. Treatment notes from March of 2016 indicate that Solomon was experiencing elbow joint pain, pain in his wrist, and hand joint pain. (Tr. 877-78). In

---

[2] While the plaintiff urges us to remand this case for an award of benefits, rather than for new administrative proceedings, for the reasons discussed herein, we find that the stringent standard for an award of benefits has not been met in the instant case.

[3] Because we are remanding this case based upon the ALJ's findings with respect to Solomon's carpal tunnel syndrome, we limit our discussion to the records of that impairment.

June of 2016, Solomon reported left shoulder pain after an automobile accident. (Tr. 957).

Solomon underwent an internal medicine examination with Dr. Ziba Monfared, M.D., in November of 2016. (Tr. 831-42). At this time, Solomon's chief complaint was his back pain, but he also reported to Dr. Monfared that he experienced numbness and tingling sensations in both arms. (Tr. 831). An examination revealed no sensory deficits, 4/5 strength in the left upper extremity, and 5/5 strength in the right upper extremity. (Tr. 834). Dr. Monfared also noted that his hand and finger dexterity were intact, and his grip strength was 5/5 bilaterally. (Id.) Dr. Monfared diagnosed Solomon with left-sided weakness of the upper extremity. (Id.)

From January through April of 2017, Dr. Adajar's notes state that Solomon was experiencing continued pain and tingling over both upper extremities. (Tr. 881, 888, 901). On examination, Solomon had limited range of motion in his left shoulder. (Tr. 882). An EMG of his left upper extremity was ordered. (Tr. 1251). Solomon was seen in August of 2017 and reported weakness in his left upper extremity, complaining that he sometimes drops objects held in his left hand. (Tr. 846). At a visit with Dr. Adajar in September of 2017, Dr. Adajar reviewed the results of Solomon's EMG, which showed bilateral ulnar neuropathy across the

5

elbow and bilateral carpal tunnel syndrome. (Tr. 1251). An X-ray of Solomon's wrists and elbows showed mild degenerative joint disease in his right elbow, left elbow, and left wrist, as well as minimal soft tissue edema in his left wrist. (Tr. 1252). Dr. Adajar recommended surgical release for Solomon's carpal tunnel syndrome in November of 2017. (Id.) On examination, he exhibited bilateral Tinel's and Phalen's signs, as well as bilateral ulnar tingling on examination of cubital tunnel.  (Tr. 1340). Treatment notes from January and February of 2018 indicate similar findings on examination. (Tr. 1278, 1299).

In February of 2018, it was noted that Solomon was scheduled for surgery on his right arm in March. (Tr. 1375). On physical examination, Solomon had nerve pain from the elbows to the hands relating to his carpal tunnel syndrome and ulnar neuropathy. (Id.) In March, Solomon underwent an elbow epicondylar release, an ulnar nerve decompression and transposition, and carpal tunnel release in his right upper extremity. (Tr. 1415). At a follow up appoint in May of 2018, it was noted that Solomon continued to have persistent symptoms over his right elbow, as well as Tinel's and Phalen's signs, and an EMG was ordered. (Tr. 1256, 1267). The results of this EMG showed left cubital tunnel syndrome and results suspicious for, but not diagnostic of, bilateral carpal tunnel syndrome. (Tr. 1381). In June of 2018, it was noted that Solomon's Tinel's and Phalen's had improved. (Tr. 1404).

6

Treatment notes from December of 2018 indicate that Solomon was "still having problems [with his] right arm" at that time. (Tr. 1433). Dr. Adajar noted that Solomon continued to complain of pain and numbness in his right wrist, and that the May 2018 EMG showed persistence of the problem. (Tr. 1435). Dr. Adajar assessed paresthesias in both of Solomon's upper extremities, and on examination, noted patchy sensory deficits in the right upper extremity. (Tr. 1435-36). Dr. Adajar made a note to refer Solomon to Lehigh Valley Orthopedics for his carpal tunnel syndrome. (Tr. 1437). In February of 2019, Dr. Adajar continued to note Solomon's paresthesias in both upper extremities and sensory patchy deficits in the right upper extremity. (Tr. 1452-53).

At a visit in April of 2019, Solomon complained to Dr. Adajar of pain in both of his hands. (Tr. 1478). It was noted that his hands were both swollen, and he was not able to make a fist. (Id.) Dr. Adajar assessed chronic hand pain, and an examination again revealed sensory patchy deficits in the right upper extremity, although his Tinel's and Phalen's were noted as improved. (Tr. 1479). Dr. Adajar's notes indicate that both of Solomon's hands were swollen and his knuckles were less prominent. (Id.) Dr. Adajar assessed Solomon with joint pain in both hands. (Tr. 1480). An X-ray of Solomon's hands at this time showed nonspecific para-articular osteopenia. (Tr. 1495, 1505). Dr. Adajar started Solomon on medication for his hand

7

pain. (Tr. 1499). Dr. Adajar also referred Solomon to a Dr. Charleton regarding his elbow and hand pain. (Tr. 1531).

Solomon continued to experience hand pain and episodes of his hands swelling. (Tr. 1515). At a visit with Dr. Adajar in August of 2019, she noted that Solomon's hands were swollen and he could not make a fist. (Id.) Throughout the remainder of 2019 and into 2020, Dr. Adajar continuously noted Solomon's chronic hand pain, the paresthesias in both upper extremities, and sensory patchy deficits in his right upper extremity, as well as improved Tinel's and Phalen's signs. (Tr. 1537-38, 1541-42, 1545-46).

On March 23, 2020, Dr. Adajar wrote a report concerning Solomon's impairments. (Tr. 1555). Regarding Solomon's upper extremity impairments, Dr. Adajar noted the 2017 EMG which showed bilateral ulnar neuropathy and bilateral carpal tunnel syndrome; Solomon's 2018 carpal tunnel release and right ulnar surgery; that Solomon's symptoms persisted after surgery and a 2018 EMG showed that his carpal tunnel and bilateral cubital tunnel symptoms persisted; and that Solomon experienced "[c]hronic pain and discomfort [] daily with periods of exacerbation and a DEXA scan was done 4/19/19 that showed Osteopenia." (Id.) Thus, Dr. Adajar opined:

> He failed surgical procedures to correct his bilateral ulnar/cubital and carpal tunnel release conditions as evidence by initial EMG/NVC on 9/18/17 and then repeated after surgery on 5/17/18.
>
> As a result, not only is his activities limited by cervical, thoracic and low back pain but he cannot perform gross and fine motor movements of his fingers because of his bilateral carpal tunnel and cubital tunnel problems.

(Id.) Dr. Adajar then further opined that Solomon could not hold gainful employment. (Id.)

Solomon also underwent a consultative independent medical evaluation with Dr. William Prebola, M.D., on May 29, 2020. (1396-1402). Dr. Prebola noted Solomon's history of bilateral arm discomfort with numbness and tingling. (Tr. 1397). He further noted that Solomon had more numbness down into his right arm at his elbow and down to his wrist. (Id.) It was noted that Solomon drops objects, especially with his right hand. (Id.) On physical examination, Solomon exhibited atrophy on the right thenar region consistent with carpal tunnel; his bilateral Tinel's remained positive; his right elbow Tinel's was negative, but his left elbow Tinel's was positive; he had diminished sensory deficits in the right median nerve distribution at the index and middle digit; and he had decreased sensation in the right L5 dermatomal pattern. (Tr. 1401). Dr. Prebola opined that Solomon was unable to perform any repetitive gripping, squeezing, or fine manipulation in both upper

extremities because of his carpal tunnel syndrome, and he was unable to perform any pushing or pulling activities. (Tr. 1402).

It was against this clinical backdrop that an ALJ conducted a second hearing regarding Solomon's disability application on April 13, 2021.[4] (Tr. 40-77). Solomon and a vocational expert both appeared and testified. (Id.) In his testimony, Solomon described the symptoms of his ulnar/cubital and carpal tunnel syndrome in terms that were entirely consistent with the consensus views of the treating and examining doctors. Thus, Solomon testified that he constantly drops things, even after his surgery in 2018, and that he had lost most of the use of his right arm, which is his dominant hand. (Tr. 49, 56). He stated that he walked with a cane but could not use it because he could not put that much pressure on his arms to hold himself up. (Tr. 49, 58). He testified that he did not perform household chores, such as cooking, cleaning, or yardwork. (Tr. 52-53). He further stated that he drops things with his left hand and that he needed surgery on his left arm but was hesitant given his failed right arm surgery. (Tr. 56-57).

---

[4] The ALJ initially denied Solomon's application for benefits on October 20, 2018, but that decision was remanded by the Appeals Council due to a very fundamental mistake; namely, the ALJ's error in relying on medical records that did not belong to Solomon when denying Solomon's claim for benefits. (Tr. 126-45, 151-55).

Following this hearing on May 3, 2021, the ALJ issued a decision denying Solomon's application for benefits. (Doc. 9-39). In that decision, the ALJ first concluded that Solomon satisfied the insured status requirements of the Act through December 31, 2020. (Tr. 15). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Solomon suffered from the following severe impairments: degenerative disc disease of the lumbar spine; asthma; cervicalgia/cervical radiculitis; carpal tunnel syndrome status-post right release; bilateral ulnar neuropathy status-post right cubital tunnel release and status-post right elbow epicondylar release with tendon debridement and reattachment; obesity; degenerative joint disease; and polyarthralgia. (Tr. 15).   At Step 3 the ALJ determined that Solomon did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 18-20).

The ALJ then fashioned an RFC that contradicted and rejected the treating and examining source opinions, finding that Solomon

> [H]ad the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant would require a sit/stand option with each interval being thirty minutes maximum each time, but would not be off task when transferring positions. He could occasionally balance, stoop, crouch, crawl, kneel, and climb, but never on ladders, ropes, or scaffolds. He could occasionally push and pull with the lower extremities including operating foot controls. *He could occasionally push and pull with the upper extremities. He would be*

11

*limited to frequent fingering and feeling for fine manipulation, and frequent grasping and handling for gross manipulation.* He would be limited to occasional overhead reaching with the upper extremities. The claimant would be limited to frequent exposure to temperature extremes of cold and heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, vibrations, and hazards, including moving machinery and unprotected heights.

(Tr. 20) (emphasis added).

In reaching this conclusion, the ALJ gave little weight to Dr. Adajar's and Dr. Prebola's opinions regarding Solomon's ability to perform gross and fine manipulation movements with his upper extremities. On this score, the ALJ gave Dr. Adajar, Solomon's treating physician, little weight. (Tr. 29). Regarding the significant manipulation limitations, which Dr. Adajar opined Solomon experienced, the ALJ reasoned that these limitations were not consistent with the overall evidence of record, reasoning that there was "no indication that he had any full loss of sensation or significantly reduce[d] strength over his hands, as noted above." (Id.) The ALJ made a similar finding with respect to Dr. Prebola's opinion, which she gave little weight, reasoning that there were no records of full loss of sensation or significantly reduced strength, and that Solomon "was generally able to make a fist [and] was able to fully extend his fingers bilaterally, as noted above." (Tr. 30). Notably, the ALJ did not explain how the lack of findings regarding full sensory loss or significantly reduced strength undermined the opinions of these treating and

12

examining physicians. Nor did the ALJ reconcile these findings with the clinical record which was replete with references to the very conditions and limitations which the ALJ asserted did not exist.

Instead, the ALJ gave partial weight to the state agency consulting opinions. On this score, The ALJ considered Dr. Monfared's November 30, 2016 opinion and gave this opinion partial weight. (Tr. 28-29). Dr. Monfared opined that Solomon could use his right hand frequently for all activities and could occasionally reach, push, and pull, and frequently handle, finger, and feel with his left hand. (Tr. 28). The ALJ noted that this opinion was rendered prior to Solomon's surgery and the majority of the medical records, and indicated that she was limiting Solomon to more restrictive limitations, in that she limited him to only occasional pushing and pulling and frequent bilateral fine and gross manipulation. (Tr. 29).

Finally, the ALJ considered the opinion of the state agency consultant, Dr. Catherine Smith, M.D., rendered in November of 2016 and gave this opinion partial weight. (Tr. 27-28). Dr. Smith opined that Solomon was not limited in pushing or pulling, and that Solomon did not have any manipulative limitations. (Tr. 121). The ALJ posited the same reasoning regarding the lack of findings of full sensory loss and significantly reduced strength, but indicated that the RFC did limit Solomon to more restrictive limitations than as opined by Dr. Smith. (Tr. 28).

Notably, none of these medical opinions from 2016 were made with the benefit of the substantial clinical record between 2016 and 2020 which thoroughly documented Solomon's on-going limitations in the use of his hands. Thus, the ALJ gave greater weight to temporally remote opinions of non-examining or non-treating sources, finding that these opinions were more persuasive than the contemporaneous treating and examining source accounts.

The ALJ also considered Solomon's testimony but found that his statements regarding her symptoms were not persuasive. (Tr. 27). The ALJ again noted that there were no records of full sensory loss or significantly reduced strength, but did identify the examination findings which showed patchy sensory deficits in his right upper extremity. (Tr. 26-27). The ALJ further reasoned that there were no findings of specific motor deficits. (Tr. 27).

Having rejected the medical opinions that were largely consistent with Solomon's subjective complaints regarding his upper extremity limitations in favor of less restrictive manipulative limitations that appear to be based on the ALJ's own subjective assessment of Solomon's medical records, the ALJ crafted this residual functional capacity assessment for Solomon based largely upon this lay evaluation of the medical evidence, in a manner that contradicted his treating source opinion,

stating that the record as a whole did not support any greater limitations than those outlined in the RFC. (30-31).

The ALJ then found that Solomon could not perform his past work as a truck driver or truck driver repairer but found at Step 5 that he could perform work available in the national economy as an officer helper worker and an information clerk. (Tr. 31-32). Notably, at the second administrative hearing, the Vocational Expert testified that the jobs she identified would not exist if a person was limited in the use of one hand, as the positions she listed required frequent use of both hands. (Tr. 66). Having reached these conclusions, the ALJ determined that Solomon had not met the demanding showing necessary to sustain his claim for benefits and denied this claim. (Tr. 33).

This appeal followed. (Doc. 1). On appeal, Solomon challenges the adequacy of the ALJ's explanation of this RFC determination, which rejected his treating source opinion in favor of a lay assessment of the clinical evidence by the ALJ. While the Commissioner contends that the ALJ properly assessed the medical opinion of Dr. Adajar, we disagree. Rather, under the controlling regulations at the time, Dr. Adajar's opinion would generally be entitled to great or even controlling weight, absent evidence to contradict her opinion. Moreover, the regulations do not

relieve the ALJ of the responsibility of adequately articulating the basis for a medical opinion evaluation.

In our view, this case illustrates the settled principles that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant," and "even though an ALJ is not bound to accept the statements of any medical expert, he may not substitute his own judgment for that of a physician," Biller, 962 F. Supp. 2d at 778–79. As discussed below, we conclude that the ALJ's burden of articulation has not been met in this appeal. Accordingly, we will order that the decision of the Commissioner be reversed in this case, and that this case be remanded for further proceedings.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but

rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis

deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. <u>See Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must

not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777

F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford</u>, 399 F.3d at 552). Thus, we are

enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply

determine whether substantial evidence supported the ALJ's findings. However, we

must also ascertain whether the ALJ's decision meets the burden of articulation

demanded by the courts to enable informed judicial review. Simply put, "this Court

requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc.</u>

<u>Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted

on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "<u>Burnett</u> does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

**B.**     **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a).   To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.   42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a).   To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.   42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed

impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e),  404.1545(a)(1),  416.920(e),  416.945(a)(1).   In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D.

Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." <u>Biller</u>, 962 F.Supp.2d at 778–79 (quoting <u>Gormont v. Astrue</u>, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal

requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here,  where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony

23

regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis

for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999).

### C.     <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinions</u>

The Commissioner's regulations in effect at the time of this claim also set standards for the evaluation of medical evidence and defined medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to afford competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. <u>See</u> 20 C.F.R. §404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical

opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c). These benchmarks, which emphasize consideration of the nature of the treating relationship, also call for careful consideration of treating source opinions.

Indeed, this court has often addressed the weight which should be afforded to a treating source opinion in a Social Security disability appeals and emphasized the importance of such opinions for informed decision-making in this field. Recently,

26

we aptly summarized the controlling legal benchmarks in this area in the following

terms:

> Under applicable regulations and the law of the Third Circuit, a treating
> medical source's opinions are generally entitled to controlling weight,
> or at least substantial weight. See, e.g., Fargnoli v. Massanari, 247 F.3d
> 34, 43 (3d Cir. 2001) (citing 20 CFR § 404.1527(c)(2); Cotter v. Harris,
> 642 F.2d 700, 704 (3d Cir. 1981)). Oftentimes referred to as the
> "treating physician rule", this principle is codified at 20 CFR
> 404.1527(c)(2), and is widely accepted in the Third Circuit. Mason v.
> Shalala, 994 F.2d 1058 (3d Cir. 1993); See also Dorf v. Bowen, 794
> F.2d 896 (3d Cir. 1986). The regulations also address the weight to be
> given a treating source's opinion: "If we find that a treating source's
> opinion on the issue(s) of the nature and severity of your impairment(s)
> is well supported by medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent with the other substantial
> evidence in your case, we will give it controlling weight." 20 CFR §
> 404.1527(c)(2). "A cardinal principle guiding disability, eligibility
> determinations is that the ALJ accord treating physicians' reports great
> weight, especially when their opinions reflect expert judgment based
> on continuing observation of the patient's condition over a prolonged
> period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)
> (citations omitted); See also Brownawell v. Commissioner of Social
> Security, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the
> treating physician's assessment, an ALJ may not make "speculative
> inferences from medical reports and may reject a treating physician's
> opinion outright only on the basis of contradictory medical evidence
> and not due to his or her own credibility judgments, speculation, or lay
> opinion." Morales v. Apfel, supra at 317.

Morder v. Colvin, No. 3:16-CV-213, 2016 WL 6191892, at *10 (M.D. Pa. Oct. 24,

2016).

Thus, an ALJ may not unilaterally reject a treating source's opinion and

substitute the judge's own lay judgment for that medical opinion. Instead, the ALJ

typically may only discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the treating source's medical opinion and the doctor's actual treatment notes justifies giving a treating source opinion little weight in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F.Supp.3d 135, 145 (M.D. Pa. 2016). However, in all instances in social security disability cases the ALJ's decision, including any ALJ judgments on the weight to be given to treating source opinions, must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Indeed, this principle applies with particular force to the opinion of a treating physician. See 20 C.F.R. §404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"). "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting

28

Mason, 994 F.2d at 1066)); see also Morales, 225 F.3d at 317. Therefore, the failure on the part of an ALJ to fully articulate a rationale for rejecting the opinion of a treating source may compel a remand for further development and analysis of the record.

### D.    The ALJ's Opinion is Not Supported by Substantial Evidence.

This case presents a striking circumstance. In fashioning an RFC for the plaintiff and denying this disability claim, the ALJ rejected two contemporaneous opinions, one rendered by a treating source and the other rendered by an examining physician, and instead fashioned an RFC that was based on temporally remote medical opinions and her lay assessment of Solomon's medical records. In our view, the ALJ's justification for this course of action—which consisted of erroneous references to the absence of medical findings that the ALJ appeared to determine herself would support the manipulative limitations set forth by these opinions—is insufficient to justify discounting the medical opinions of these treating and examining sources, particularly where these limitations, if credited, would have precluded the jobs identified by the Vocational Expert which the ALJ found at Step 5 Solomon could perform. Therefore, we find that substantial evidence does not support the ALJ's decision in this case.

The ALJ's treatment of the medical opinion evidence is wanting in several respects. At the outset, the ALJ's RFC determination improperly rejected the opinions of Dr. Adajar and Dr. Prebola, both of whom found that Solomon could not perform any fine or gross manipulative movements with his bilateral upper extremities because of his ulnar/cubital and carpal tunnel syndrome. The ALJ then fashioned an RFC that was unsupported by any medical opinion. Indeed, while the ALJ's manipulative limitations were more restrictive than those set forth by the state agency consulting doctors, the ALJ's determination that Solomon could frequently perform fine and gross manipulation movements with both upper extremities appears to be based on her own subjective assessment of the treatment records. On this score, the ALJ consistently references the absence of treatment records which show full sensory loss and/or significantly reduced strength in the bilateral upper extremities. However, on this score, the ALJ misstates the medical record. That clinical history does, in fact, contain numerous references to impairments and limitations experienced by Solomon in terms of the use of his hands. The ALJ then fails to explain how the absence of such records contradicts the treating and examining source opinions which found that Solomon could not perform any manipulative movements. Accordingly, we find that the ALJ's decision ran afoul of the rule that in fashioning a residual functional capacity assessment for a claimant an ALJ may

30

not unilaterally reject all medical opinions in favor of the ALJ's own subjective impressions. See Durden v. Colvin, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

This RFC determination also runs afoul of the long-standing treating physician rule which applies in this case. As we have observed:

> Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. See, e.g., Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 CFR § 404.1527(c)(2); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). Oftentimes referred to as the "treating physician rule", this principle is codified at 20 CFR 404.1527(c)(2), and is widely accepted in the Third Circuit. Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993); See also Dorf v. Bowen, 794 F.2d 896 (3d Cir. 1986). The regulations also address the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 CFR § 404.1527(c)(2). "A cardinal principle guiding disability, eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); See also Brownawell v. Commissioner of Social Security, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." Morales v. Apfel, supra at 317.

Morder v. Colvin, 216 F.Supp.3d 516, 528 (M.D. Pa. 2016).

In this case, we find that the ALJ's decision denying Solomon's application violated the treating physician rule when the ALJ gave little weight to Dr. Adajar's 2020 opinion without an adequate explanation for rejecting the treating doctor's limitations. Indeed, Dr. Adajar's opinion was supported by her own treatment notes, which consistently documented Solomon's pain in his bilateral upper extremities due to his ulnar/cubital and carpal tunnel syndrome during the relevant time period. Moreover, the only opinions in the record that contradicted Dr. Adajar's opinion were rendered four years prior to Dr. Adajar's opinion and without the benefit of Solomon's treatment notes reflecting these impairments. Indeed, while Solomon complained of upper arm pain in 2016, it was not until 2017, *after* these consulting sources rendered their opinions, that he was diagnosed with ulnar/cubital and carpal tunnel syndrome. While "[t]he Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it," Chandler, 667 F.3d at 361, even the ALJ recognized that the record in the instant case contained "evidence received after th[e] consultant[s] reviewed the file." (Tr. 28). This is particularly troubling in the instant case where, if credited, the limitations identified by Solomon's treating physician and confirmed by the examining source would have precluded the jobs identified by the Vocational Expert that the ALJ found Solomon could perform. Thus, we cannot conclude that the ALJ provided an

adequate explanation for discounting this treating source opinion, and instead, fashioned an RFC largely determined by her own subjective assessment of the medical records.

On this score, the ALJ discredited the limitations set forth by Solomon's treating doctor without explaining how those limitations were not supported by the record, gave partial weight to the state agency consultants who rendered their opinions prior to the majority of Solomon's medical records regarding these upper extremity impairments, and fashioned an RFC that was not supported by any medical opinion but rather was based upon the ALJ's own subjective determination that the medical record did not contain evidence to support the treating doctor's limitations regarding fine and gross manipulation. While we recognize that "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason,'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999), we find that the ALJ's explanation for rejecting Dr. Adajar's opinion was in error.

In our view, given the regulations governing evaluation of medical opinion evidence at the time of this disability application, more is needed by way of an explanation. Since the ALJ's burden of articulation is not met in the instant case, this matter must be remanded for further consideration by the Commissioner. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be

deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.[5]

## IV.   <u>**Conclusion**</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.


<u>/s/ *Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge


Dated: February 27, 2023

---

[5] We recognize that Solomon has argued that we should remand with an award of benefits. While we possess the discretion to award benefits, case law makes it clear that this discretion should be exercised sparingly and the Commissioner should be given every reasonable opportunity in the first instance to reassess a flawed disability analysis. Guided by these principles, we are declining the invitation to award benefits in this case at this time in favor of a more thorough, dispassionate re-evaluation of this claim by the Commissioner.